**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 26-80-DLB**

**J.Z.S.**                                                                                          **PETITIONER**

**v.**                              **MEMORANDUM OPINION AND ORDER**

**MARC FIELDS, et al.,**                                                        **RESPONDENTS**

**\* \* \* \* \* \* \* \* \* \***

## I.   INTRODUCTION

This matter is before the Court on Petitioner J.Z.S.'s Petition for Writ of Habeas Corpus (Doc. # 1).[1]  Respondent Olson having filed his Response[2]  (Doc. # 6), and Petitioner having filed his Reply (Doc. # 7), this matter is now ripe for review.  For the following reasons, the Court will **grant** the Petition.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Petitioner J.Z.S. is a nineteen-year-old native and citizen of Venezuela.  (Doc. # 1 ¶ 1).  By way of background, Petitioner's childhood in Venezuela was extremely difficult. At only four years old he was diagnosed with attention deficit hyperactivity disorder

---

[1]      Also before this Court is Petitioner's Motion for Leave to Proceed under the Pseudonym J.Z.S. (Doc. # 3).  Petitioner cites that he is a nineteen-year-old citizen of Venezuela who fled at seventeen years old due to the child abuse and mental health issues he faced while in Venezuela. (Doc. # 3 at 1).  Respondent Olson does not oppose this Motion.  Therefore, the Court will **grant** Petitioner's Motion for Leave to Proceed under the Pseudonym (Doc. # 3).

[2]      Petitioner files this action against Samuel Olson, Acting Field Office Director, Chicago Field Office, Immigration and Customs Enforcement ("ICE") and Marc Fields, Jailer, Kenton County Detention Center.  (Doc. # 1).  Respondent Fields did not file a Response and the time to do so has passed.

("ADHD").  (*Id*. ¶ 15).  As a result, Petitioner suffered from impulse control issues, hyperactivity, and aggression which would manifest as behavioral issues at school.  (*Id*.).  When the school would inform his parents about his behavioral issues, his father would respond by hitting him.  (*Id*.).  After repeated behavioral incidents, Petitioner's father pulled him out of school and did not reenroll him until he was eight years old.  (*Id*.).  When Petitioner was twelve years old his mother fled Venezuela and moved to the United States, leaving Petitioner with his father.  (*Id*. ¶ 17).  Petitioner continued to suffer severe physical and emotional abuse at the hands of his father, some of which was "compounded by violence from police officers, some of whom were friends of his father."  (*Id*.).  For five years Petitioner suffered abuse at the hands of his father, and on numerous occasions left home due to this violence, sometimes spending multiple weeks away from home.  (*Id*. ¶ 20).  By the time he was seventeen years old, Petitioner decided to flee from his home in Venezuela and reunite with his mother in Chicago.  (*Id*. at 23).

Petitioner entered the United States on November 10, 2023, near Eagle Pass, Texas where he was briefly detained by Border Patrol Agents before being released on his own recognizance.  (Doc. # 6-1 at 2).  He was issued a Notice to Appear which checked the box marked "[y]ou are an alien present in the United States who has not been admitted or paroled" and was ordered to appear before an Immigration Judge ("IJ") on August 20, 2026.  (Doc. # 6-2 at 1).

Despite making it to the United States, Petitioner's life was still fraught with violence and struggle.  Almost immediately upon arriving to the United States he was hospitalized for two weeks after he began having "paranoid thoughts and delusions about

being watched."  (Doc. # 1-5 at 2).  Petitioner was diagnosed with psychosis and was ordered to continue inpatient treatment.  (*Id*.).

Months later, on August 31, 2024, Petitioner was arrested by the Chicago Police Department for Theft of Labor when he jumped over a turnstile without paying for a ticket.  (Doc. # 1-7 at 2).  Two months later Petitioner moved to Florida to find work.  (Doc. # 1 ¶ 25).  Petitioner claims that while in Florida he lived with an older man who he had loaned some money to.  (*Id*.).  Petitioner alleges that when he asked the man for his money back the man ordered Petitioner to leave, and when Petitioner did not, the man attacked him with a knife.  (*Id*.).  Petitioner claims that at that point he fled, and the man called the police on him, falsely claiming he was the one with the knife.  (*Id*.).  When the police later encountered Petitioner, he states that he was unable to communicate in English but "pantomimed with his arms to attempt to communicate that the man had tried to harm him with a knife."  (*Id*. ¶ 26).  Petitioner alleges that the officers, however, perceived this as acting "erratic and volatile" and arrested him.  (*Id*.).  Petitioner's version of these events is not reflected in the Arrest Affidavit.  (*See* Doc. # 1-6 at 10-13).

As a result of this incident, Petitioner was charged with two counts of resisting arrest without violence, aggravated assault, and battery.  (*Id*. at 2).  With the exception of one count of resisting arrest, all other counts were dropped, and no official indictment was ever filed.  (*Id*. at 3).  Petitioner pled guilty to a single count of obstructing or resisting an officer without violence.  (*Id*. at 6).  On January 21, 2025, the Sixth Judicial Circuit for Pinellas County, Florida Division, entered a judgment sentencing Petitioner to time served.  (*Id*.).

Petitioner was then released, but at that time, was not picked up by ICE. It was not until nearly a month later, on February 20, 2025, when he attended a routine check-in in Chicago was he arrested by ICE pursuant to a Warrant for Arrest of Alien. (Doc. # 6-3 at 1). In May of 2025, Petitioner filed a motion for a bond hearing, which was granted and took place on May 15, 2025. (Doc. # 1 ¶ 30). Petitioner states that at the hearing the burden was placed on him to demonstrate that he was not a danger to the community nor a flight risk. (*Id*.). At the conclusion of the hearing, the IJ denied bond. (*Id*. ¶ 32). The Order by the IJ merely stated that bond was "[d]enied, because [d]anger, flight risk." (Doc. # 1-8). Petitioner claims that he has not yet received a custody hearing where the burden was on the government to justify his detention. On August 18, 2025, nearly six months after being initially detained, Petitioner was served with a document titled "Additional Charges of Inadmissibility/Deportability" in which Petitioner was charged with being an "Immigrant Without an Immigrant Visa" pursuant to Section 212(a)(7)(A)(i)(I). (Doc. # 6-2 at 4).

On February 23, 2026, more than a year after he had initially been detained by ICE, J.Z.S. filed the instant Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 (Doc. # 1). In his Petition, J.Z.S. requests that the Court order his immediate release, or in the alternative, order for a second bond hearing, in which the government bears the burden to establish by clear and convincing evidence that he presents a flight risk or danger to the community. (Doc. # 1 at 27-28). On February 24, 2026, the Court directed Respondents to respond to the Petition. (Doc. # 5). Respondent Olson having filed his Response (Doc. # 6), and Petitioner having filed his Reply (Doc. # 7), this matter is ripe for the Court's review.

## III.   ANALYSIS

Petitioner alleges that his Fifth Amendment Due Process rights are being violated. (Doc. # 1 ¶ 82).  Petitioner first alleges that the custody determination he received when he was initially detained "violated due process because the burden was unconstitutionally placed on him to demonstrate that he was *not* a danger to the community or a flight risk." (*Id*. ¶ 83) (emphasis in original).  Petitioner argues that "on this basis alone" he is entitled to release, or alternatively, a new custody hearing.  (*Id*.).  Petitioner additionally contends that he is entitled to release or a new custody hearing where the government bears the burden "because his 12-month detention has become unreasonably prolonged."  (*Id*. ¶ 84).

Respondent argues that Petitioner is not entitled to relief for two separate reasons. (Doc. # 6 at 1).  First, Respondent argues that Petitioner is an "applicant for admission" and therefore is "properly detained under 8 U.S.C. § 1225(b)(2)" and thus not entitled to relief. [3]  (*Id*.).  Additionally, Respondent argues that even if he were entitled to a bond hearing, he received a constitutionally adequate bond hearing in May of 2025, and this Court is precluded from reviewing the "IJ's discretionary decision to deny Petitioner bond." (*Id*. at 7-10).  In his Reply, Petitioner disagrees with Respondent, arguing that he is being detained under 8 U.S.C. § 1226(a), and that this court has the jurisdiction to order a new bond hearing on the grounds that the one he did receive was constitutionally inadequate. (Doc. # 7 at 10).

---

[3]   The Court notes that despite Petitioner's previous conviction and incarceration, Respondent has not put forth any argument that Petitioner is detained pursuant to 8 U.S.C. § 1226(c).

Because the parties dispute whether Petitioner is being properly detained under 8 U.S.C. § 1225(b)(2) and is therefore not entitled to any bond hearing, let alone an additional one, the Court will first address whether Petitioner is being held under §§ 1225(b)(2) or 1226(a).

## A. Petitioner is detained pursuant to § 1226(a)

At its core, habeas provides "a remedy for unlawful executive detention" *Munaf v. Geren*, 553 U.S. 674, 693 (2008), available to "every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004). A district court may grant a writ of habeas corpus to any person who shows that he is detained within the court's jurisdiction in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2241(c)(3). The Supreme Court has recognized that habeas relief extends to noncitizens. *See Rasul v. Bush*, 542 U.S. 466, 483 (2004) ("[Alien] Petitioners contend that they are being held in federal custody in violation of the laws of the United States . . . Section 2241, by its terms, requires nothing more.").

Enacted in 1952, the Immigration and Nationality Act (INA) consolidated previous immigration and nationality laws and now contains "many of the most important provisions of immigration law." U.S. Citizenship and Immigration Services, Immigration and Nationality Act (July 10, 2019), https://www.uscis.gov/lawsandpolicy/legislation/immigrationandnationalityact#:~:text=The%20Immigration%20and%20Nationality%20Act,the%20U.S.%20House%20of%20Representatives. Relevant to J.Z.S.'s Petition, Congress has established two statutes, codified in Title 8, which govern detention of noncitizens pending removal proceedings— 8 U.S.C. §§ 1225 and 1226.

The first statute, 8 U.S.C. § 1225 is titled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." It states, in pertinent part:

**(b)    Inspection of applicants for admission**

**(2)    Inspection of other aliens**

**(A)    In general**

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229(a) of this title.

8 U.S.C. § 1225(b)(2)(A). Important to note, for purposes of this provision, "an alien who is an applicant for admission" is defined as an "alien present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1).

The second provision at issue, 8 U.S.C. § 1226, is titled "Apprehension and detention of aliens" and reads:

**(a) Arrest, detention, and release**

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—

(1)    May continue to detain the arrested alien; and

(2)    May release the alien on—

(A)    Bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General . . . .

8 U.S.C. § 1226(a).

Section 1226(c) of the INA was amended by Congress in January 2025 with the enactment of the Laken Riley Act, which added a new subsection under Section 1226(c), requiring mandatory detention in certain circumstances. Pub. L. No. 119-1, § 2, 139 Stat. 3, 3 (2025). The amendment added a two-step process, in which the Attorney General must detain a noncitizen if

> (1) they are inadmissible because they are in the United States without being admitted or paroled, obtained documents or admission through misrepresentation or fraud, or lacks valid documentation and

> (2) is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person.

*Barrera v. Tindall*, No. 3:25-cv-541-RGJ, 2025 WL 2690565, at *3 (W.D. Ky. Sep. 19, 2025) (quoting U.S.C. §§ 1226(c)(1)(E)(i)-(ii)).

Pursuant to 8 U.S.C. § 1226(a), noncitizens who are arrested and detained have the right to request a bond hearing before an IJ. Conversely, under 8 U.S.C. § 1225(b)(2)(A), all aliens deemed to be applicants for admission *must* be detained. As noted *supra*, J.Z.S., a noncitizen who has lived in the United States for over two years, has been detained by ICE and is being held at the Kenton County Detention Center. The initial question this Court must ask, then, is whether J.Z.S. must be detained without a hearing under § 1225(b)(2), or whether he has the right, generally, to request a meaningful bond hearing pursuant to § 1226.[4]

---

[4] The Court notes that the matter before this Court is *not* whether the executive branch has the authority to direct ICE/DHS to detain and deport noncitizens. The question before the Court is a narrower one, to wit, whether those noncitizens—specifically Petitioner J.Z.S.—are entitled to request a bond hearing before an IJ prior to their removal hearing pursuant to 8 U.S.C. § 1226(a) or must be mandatorily detained pursuant to 8 U.S.C. § 1125(b)(2)(A).

### 1. *Statutory Interpretation*

The basic facts of this case are not in dispute.  Rather, the first issue concerns which statute applies to Petitioner.  J.Z.S. argues that he is being detained in the Kenton County Detention Center in violation of his Fifth Amendment due process rights.  (Doc. # 1 at 27-28).  Conversely, Respondent contends that Petitioner is properly detained pursuant to the mandatory detention scheme of § 1225(b)(2).  (Doc. # 6 at 2).  Thus, the Court must determine whether § 1225(b)(2) applies to J.Z.S.'s detention.  This determination raises a question of statutory interpretation.  In interpreting statutes, district courts must "use every tool at their disposal to determine the best reading of the statute." *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 400 (2024).  Statutes must be given their "ordinary, contemporary, common meaning" *Walters v. Metro Edu. Enters., Inc.*, 519 U.S. 202, 207 (1997), while also being read "in their context and with a view to their place in the overall statutory scheme."  *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012).

The Court starts with the plain language of the statute, and begins by looking at the first words one may read—the title.  A "[c]ourt gives each and every word meaning, and this includes the title."  *Barrera*, 2025 WL 2690565, at *4.  While section headings are not dispositive, "they are instructive and provide the Court with the necessary assurance that it is at least applying the right part of the statute in a given circumstance." *Lopez-Campos v. Raycraft*, No. 2:25-cv-12486, 2025 WL 2496379, at *8 (E.D. Mich. Aug. 29, 2025); *see also  Dubin v. United States*, 599 U.S. 110, 120-21 (2023) ("This Court has long considered that the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.") (internal quotations and citations omitted).

9

Section 1225 is titled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for a hearing[.]"  Section 1226 is titled "apprehension and detention of aliens" with a focus on "arrest, detention, and release[.]"  Thus, the text of the titles indicate that § 1225 governs "arriving" noncitizens who are *presently* "seeking admission" into the United States,[5] while § 1226 focuses on the apprehension and detention of those noncitizens already present in the country.  *See Edahi v. Lewis*, No. 4:25-cv-129-RGJ, 2025 WL 3466682, at *7 (W.D. Ky. Nov. 27, 2025) ("The added word of 'arriving' supports the notion that the statute governs 'arriving' noncitizens, not those present already.").

Section 1225(a)(1) states that an "applicant for admission" is "an alien present in the United States who has not been admitted or who arrives in the United States."  Under § 1225(b)(2)(A) any applicant for admission who is "seeking admission" and "is not clearly and beyond a doubt entitled to be admitted" must be detained.  The analysis then, is twofold.  For a noncitizen to be mandatorily detained under § 1225(b)(2)(A), they must be an applicant for admission who is also seeking admission.  Other district courts have acknowledged that this "question is puzzling at first blush.  How can an 'applicant for admission' not 'seek admission?'"  *J.G.O. v. Francis*, No. 25-cv-7233, 2025 WL 3040142, at *3 (S.D.N.Y. Oct. 28, 2025).  However, this question is answered by looking to the statutory definition.  To be an applicant for admission, "[a]ll that's needed is presence without admission—in other words, it applies to the great number of undocumented immigrants who currently live here."  *Id*.  By contrast, seeking admission "might mean

---

[5]     This is supported by the text of § 1225, which focuses on limited and specific methods of entry, for example, via "crewman" or "stowaways," leading to the conclusion that "Section 1225 is much more limited in scope than the United States asserts."  *Barrera*, 2025 WL 2690565, at *4.

10

something more than that—some active desire or process toward admission." *Id*.  One's *status* as an "applicant for admission" under the definitional language of § 1225(a)(1) is distinct from the *act* of "applying for" or "seeking" admission.  Congress provided a clear definition of aliens who are "applicants for admission."  8 U.S.C. § 1225(a)(1).  And this definition turns on an individual's physical presence in the United States.  *Id.*  Thus, an alien present in the United States can qualify as an "applicant for admission" under § 1225 without also "seeking admission" by necessity.  Because J.Z.S. is neither an "arriving alien" nor "seeking admission" into the United States, the mandatory detention provisions contained § 1225(b)(2) do not apply to him.[6]

Respondent disagrees with this reading and takes the position that merely because Petitioner is an "applicant for admission" according to the INA, he is subject to the mandatory detention provisions of § 1225(b)(2).  (Doc. # 6 at 4).  Respondent's interpretation of § 1225(b)(2)(A), therefore, calls for mandatory detention of *every* noncitizen present in the United States who has not been lawfully admitted.  (*See id.* ("Section 1225 mandates the detention of any 'applicant for admission' who cannot show that they are 'clearly and beyond a doubt entitled to be admitted.'")).  The Court finds this interpretation much too broad.  *See Maldonado v. Olson*, No. 25-cv-3142, 2025 WL 2374411, at *12 (D. Minn. Aug. 15, 2025) ("[A]ccepting Respondents' one-size-fits-all

---

[6]    Moreover, neither party contends that Petitioner's pending application for Special Immigrant Juvenile Status ("SIJS") impacts whether he is "seeking admission" under 1225(b)(2)(A).  Even if they had, that fact is not dispositive because he did not apply for SIJS when he was 'arriving' to the United States.  Rather, Petitioner did not submit his first SIJS application until June of 2025, four months after he was detained by ICE.  *See Santos Francos v. Raycraft*, No. 2:25-cv-13188, 2025 WL 2977118, at *7 (E.D. Mich. Oct. 21, 2025) ("And even if Respondent argues that [the petitioner] is 'seeking admission' because he applied for asylum . . . that was not done when he was 'arriving' to [the United States]. So the applicability of § 1225(b)(2)(A) would still be incorrect.").

application of 1225(b)(2) to all aliens, with no distinctions, would violate fundamental canons of statutory construction.").

In reaching this conclusion, Respondent misconstrues, or ignores entirely, the phrase "seeking admission."  The use of the present progressive term "seeking" "implies action."  *Barrera*, 2025 WL 2690565 at *4; *see also Diaz v. Marinez,* 792 F. Supp. 3d. 211, 218 (D. Mass. 2025) ("[T]he phrase 'seeking admission[,]' [though] undefined in the statute[,] [] necessarily implies some sort of present-tense action."); *Edahi*, 2025 WL 3466682 at *8 ("Seeking means 'to go in search of' and is synonymous with 'pursue.'" (quoting Webster's Dictionary (11th ed. 2024))).

Furthermore, the INA defines the term "admission" as "the lawful *entry* of the alien into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A) (emphasis added).  Given that the word "entry" is left undefined by the INA, courts interpret it according to its "ordinary, contemporary, common meaning." *Star Athletica, LLC v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017) (internal quotations omitted); *see also Gustafson v. Alloyed Co., Inc.*, 513 U.S. 561, 585 (1995) (Thomas, J., dissenting) ("The canon that we construe a statutory term in accordance with its ordinary or natural meaning applies only in the absence of a statutory definition." (cleaned up)). "That meaning is 'entering into . . . (a country),' which is '[t]o come or go in.'" *J.G.O.*, 2025 WL 3040142, at *3 (quoting *Entry*, OXFORD ENGLISH DICTIONARY (2d ed. 1989); *Enter*, OXFORD ENGLISH DICTIONARY (2d ed. 1989)).

Thus, it cannot be said that J.Z.S., a noncitizen who has resided in the United States for over two years is "actively seeking admission."  *See id.* ("'[S]eeking admission' requires an alien to continue to want to go into the country. The problem . . . is that [the

12

petitioner] is already here; you can't go into a place where you already are."). Furthermore, seeking lawful status or relief from removal is not the same as "seeking admission." *See Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021) (observing that "[l]awful status and admission . . . are distinct concepts in immigration law: Establishing one does not necessarily establish the other"). Thus, a noncitizen present in the United States may seek lawful status without simultaneously seeking admission. *Id.* (noting that a noncitizen who received Temporary Protected Status was not therefore constructively admitted to the United States).

Numerous district courts have come to the same conclusion. *See Barrera*, 2025 WL 2690565, at *4 ("Noncitizens who are present in the country for years, like [petitioner] who has been here 20 years, are not actively 'seeking admission.'"); *Lopez-Campos*, 2025 WL 2496379, at *7 ("There is no logical interpretation that would find that Lopez-Campos was actively 'seeking admission' after having resided here, albeit unlawfully, for twenty-six years."); *Ochoa Ochoa v. Noem*, No. 25-cv-10865, 2025 WL 2938779, at *6 (N.D. Ill. Oct. 16, 2025) ("In agreement with other district courts, this court rejects Respondents' expanded reading of 1225(b)(2) and the term "seeking admission."). Likewise, the Seventh Circuit—the only circuit court to address the issue—agreed with this reading. *Castañon-Nava v. U.S. Dep. Homeland Sec.*, 161 F.4th 1048, 1061 (7th Cir. 2025) ("[p]ut another way, 'U.S. immigration law authorizes the Government to detain certain aliens *seeking admission* into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c)'") (emphasis in original) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018)). To adopt Respondent's

13

interpretation of § 1225(b)(2)(A) would render the phrase "seeking admission" "mere surplusage by equating it to 'applicant for admission.'"  *Ochoa Ochoa*, 2025 WL 2938779, at *6; *see also Castañon-Nava*, 161 F.4th at 1061 (noting that such a construction "would render § 1225(b)(2)(A)'s use of the phrase 'seeking admission' superfluous, violating one of the cardinal rules of statutory construction"); *J.G.O.*, 2025 WL 3040142, at *3 ("[T]his is just another example of the government's construction inviting surplusage into the statute. That Congress chose to include this additional phrase—'seeking admission' . . . suggests that it must mean something distinct.").  The Court declines to adopt such an expansive reading of § 1225(b)(2)(A).

The Court now turns to the plain language of § 1226, which controls the "apprehension and detention of aliens."  Section 1226(a) permits a bond hearing if an "alien" who was "arrested and detained" on a "warrant issued by the Attorney General" remains in detention "pending a decision on whether the alien is to be removed from the United States."  The plain meaning of the statute is clear and applicable to J.Z.S.—an alien who was arrested and detained by ICE and remains in detention pending removal proceedings.  (*See* Doc. # 1).  This is further bolstered by the record.

That § 1225(b)(2)(A) applies to noncitizens seeking admission into the United States while § 1226 applies to those noncitizens who are already present in the United States comports with the broader structure and context of our immigration law.  *Castañon-Nava*, 161 F.4th at 161-62.  Indeed, "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) (noting that "our immigration laws have long made a distinction

14

between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, *irrespective of its legality*") (emphasis added).

Here, on the November 10, 2023 Notice to Appear issued to Petitioner, DHS checked the box labeled "[y]ou are an alien *present* in the United States who has not been admitted or paroled" rather than checking the box labeled "*arriving* alien." (Doc. # 6-2 at 1) (emphasis added). Moreover, the I-200 Warrant for Arrest of Alien cited INA § 236 as the authority for J.Z.S.'s detention. (Doc. # 6-3). INA § 236 is codified at 8 U.S.C. § 1226. Additionally, the I-213 Narrative states that Petitioner was "released by an Immigration Officer on Order of Release own Recognizance due to lack of space." (Doc. # 6-1 at 2). While no documentation outside of this I-213 Narrative was submitted to show that Petitioner was released on his own recognizance, a typical Order of Release on Recognizance permits DHS to release noncitizens pursuant to INA § 236. See U.S. Immigration and Customs Enforcement, I-220A https://www.ice.gov/doclib/detention/checkin/I_220A_OREC.pdf. Finally, the fact that Petitioner *did* receive a bond hearing when he was detained in 2025 leads this Court to conclude that he is being detained pursuant to § 1226. This supports this Court's conclusion and reaffirms the Supreme Court's determination in *Jennings v. Rodriguez,* that § 1226(a) applies to aliens already present in the United States, while § 1225(b)(2)(A) applies to arriving aliens. Respondent's new post hoc position is simply "impermissible." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020) (holding that "[t]he basic rule is clear: [a]n agency must defend its actions based on the reasons it gave when it acted," not on "impermissible post hoc rationalizations").

15

Most compelling for this Court is the addition of the Laken Riley Act, signed into law in January 2025.  The Laken Riley Act, which was incorporated into § 1226(c), provides that noncitizens who have been charged with, convicted of, or admitted to committing various listed crimes, are subject to mandatory detention.  8 U.S.C. § 1226(c). If, as Respondent argues, Congress had intended for § 1225 to govern all noncitizens who are present in the country, regardless of when or where they were detained, then why did Congress even bother passing that legislation?  If Respondent's reading of § 1225 is correct, then the addition of the Laken Riley Act would be superfluous.  The Laken Riley Act added a mandatory detention requirement, "in an otherwise discretionary Section."  *Barrera*, 2025 WL 2690565, at *4.   As other courts have noted,

> [i]f § 1225(b)(2) already mandated detention of any alien who has not been admitted, regardless of how long they have been here, then adding § 1226(c)(1)(E) to the statutory scheme was pointless and this Court, too, 'will not find that Congress passed the Laken Riley Act to 'perform the same work' that was already covered by § 1225(b)(2).

*Lopez-Campos*, 2025 WL 2496379, at *8 (quoting *Maldonado*, 2025 WL 237441, at *12); *see also id*. ("Respondents' interpretation of the statutes would render [the Laken Riley Act] superfluous); *Ariza v. Noem*, No. 4:25-cv-165-RGJ, 2025 WL 3722014, at *6 (W.D. Ky. Dec. 23, 2025) ("If Section 1225(b)(2)(A) governed certain noncitizens as the United States claims it does, the Laken Riley Act would have been redundant and unnecessary."); *Gomes v. Hyde*, No. 1:25-cv-11571, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025) ("Such an interpretation, which would largely nullify a statute Congress enacted this very year, must be rejected."); *Martinez v. Hyde*, 792 F. Supp. 3d. 211, 221 (D. Mass. 2025) ("[I]f, as the Government argue[s] ... a non-citizen's inadmissibility were alone already sufficient to mandate detention under section 1225(b)(2)(A), then the 2025

16

amendment would have no effect. This is a presumptively dubious result."); *Selvin Adonay E.M. v. Noem et al*, No. 25-cv-3975, 2025 WL 3157839, at *6 (D. Minn. Nov. 12, 2025) ("the presumption against superfluity is at its strongest because the Court is interpreting two parts of the same statutory scheme, and Congress even amended the statutory scheme this year when it passed the Laken Riley Act."). This Court agrees with its sister courts.

Respondent fails to elaborate when, if § 1225(b)(2) applies to *every single* noncitizen's detention proceeding, § 1226 would ever, if at all, come into play. The Court finds it difficult to conceive of a situation in which Congress would enact an insignificant superfluous statute for no other reason than to add words to the page. *See Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

Finally, pertinent legislative history reinforces the Court's conclusion. *See Loper Bright,* 603 U.S. at 386 ("[T]he longstanding practice of the Government—like any other interpretive aid—can inform [a court's] determination of what the law is."). Enacted in 1952, the INA "distinguished between aliens physically arriving in the United States and those who had entered the Country." Library of Congress, *Immigration Detention: A Legal Overview* (Sep. 16, 2019), https://www.congress.gov/crs-product/R45915#_Ref17891326. In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") which focused on whether the

17

noncitizen "had been lawfully admitted into the country by immigration authorities."  *Id*. Since the IIRIRA's enactment "the statutory framework governing detention has largely remained constant."  *Id*.  In applying the INA to detention proceedings, the Government has, for the past thirty years, consistently applied § 1226(a).  It was not until July of 2025 when DHS/ICE announced a new policy, titled "Interim Guidance Regarding Detention Authority for Applicants for Admission" where it deemed all persons who entered the United States without inspection "applicants for admission" under § 1225, that the Government changed course.  U.S. Customs and Border Protection, *Detention of Applicants for Admission*, (Sep. 18, 2025) https://www.cbp.gov/document/foia-record/detention-applicants-admission; *see also Lopez-Campos*, 2025 WL 2496379 at *5 ("For the past 30 years, the Government has applied Section 1226(a)[.]" It is only "now that . . . they want the Court to declare that the application of Section 1226(a) is incorrect.").  This sudden change contradicted the long-established understanding that § 1225(b) "applies primarily to aliens seeking entry into the United States" while § 1226(a) "applies to aliens already present in the United States."  *Jennings*, 583 U.S. at 298, 303; *see also id*. at 288 ("Section 1226(a) sets out the default rule for those aliens [already present in the United States.]").  Thus, the enforcement history reflects a longstanding practice of applying § 1226(a) to noncitizens already residing in the country, which is "powerful evidence that interpreting [the INA] in that way is natural and reasonable[.]" *Abramski v. U.S.*, 573 U.S. 169, 202-203 (2014) (Scalia, J., dissenting).

"The plain language of the statutes, the overall structure, the intent of Congress, and over 30 years of agency action make clear that Section 1226(a) is the appropriate statutory framework … for noncitizens who are already in the country and facing removal."

18

*Lopez-Campos*, 2025 WL 2496397, at *5.  Therefore, the Court finds that Petitioner is not subject to § 1225(b)(2)(A).  Rather, the facts of the case make clear that his detention is governed by § 1226(a).[7]

### B.  Constitutionally adequate bond hearing

Because Petitioner is being detained pursuant to § 1226(a), the Court must determine whether his due process rights were violated when the IJ placed the burden on him, rather than the government, in his May 2025 bond hearing.  While Respondent notes that there was "plenty of evidence to support the denial" of bond, he does not deny that the IJ placed the burden on Petitioner.   (Doc. # 6 at 7).  Instead, Respondent argues that placing the burden on a noncitizen in immigration custody hearings is not a violation of their constitutional rights and is consistent with the Board of Immigration Appeals' ("BIA") practice and guidance.  (*Id*. at 8-10).  The Court disagrees.

As a preliminary matter, this Court must first address Respondent's argument that "this Court lacks jurisdiction to review the sufficiency of the bond hearing under 8 U.S.C. § 1226(e), which precludes review of the IJ's discretionary decision to deny Petitioner bond[.]"   (Doc. # 6 at 7).   While district courts do not have jurisdiction to review

---

[7]      The Court acknowledges that the Fifth and Eighth Circuit Courts of Appeals have reached the opposite conclusion. *Buenrostro-Mendez v. Bondi*, No. 25-20496, 2026 WL 323330 (5th Cir. Feb. 6, 2026); *Avila v. Bondi*, No. 25-3248, 2026 WL 819258 (8th Cir. Mar. 25, 2026).  However, these decisions provide, at most, persuasive authority. *See Wright v. Spaulding*, 939 F.3d 695, 699 (6th Cir. 2019) (noting that holdings of other circuit courts of appeals do not bind courts in the Sixth Circuit).  And another Circuit Court has disagreed with the Fifth and Eighth Circuits' reasoning—albeit in a different procedural context. *See Buenrostro*, 2026 WL 323330, at *4 n. 8 (recognizing the Seventh Circuit's conflicting decision in *Castañon-Nava v. U.S. Dep't. of Homeland Sec.*, 161 F.4th 1048 (7th Cir. 2025)).  The Sixth Circuit is poised to take up the statutory interpretation issue raised by Petitioner in *Lopez-Campos v. Raycraft*, Case No. 25-1965 (6th Cir. Oct. 27, 2025).  Indeed, the Sixth Circuit held oral arguments in *Lopez-Campos* on March 18, 2026 pursuant to an expedited schedule.  *See* Doc. # 42, No. 25-1965.  In the absence of an authoritative decision from the Sixth Circuit Court of Appeals, the Court respectfully declines to adopt the Fifth Circuit's holding in *Buenrostro-Mendez* or the Eighth Circuit's holding in *Avila*.

discretionary decisions made by an IJ, "this limitation applies only to 'discretionary' decisions about the 'application' of § 1226 to particular cases. It does not block lawsuits over the 'extent of the Government's detention authority under the "statutory framework" as a whole.'" *Nielsen v. Preap*, 586 U.S. 392, 401 (2019) (quoting *Jennings v. Rodriguez*, 583 U.S. 295-96 (2018)). Here, Petitioner is not challenging the IJ's discretionary decision to deny him bond. Rather, he is arguing that an immigration bond hearing pursuant to § 1226(a) that places the burden of proof on the noncitizen to show they are not a danger or a flight risk is constitutionally inadequate. (Doc. # 1). Thus, this Court is not barred by § 1226(e) because "[t]his type of constitutional claim 'falls outside the scope of § 1226(e)' because it is not a matter of the IJ's discretionary judgment." *Alvarez Figueroa v. McDonald*, 680 F. Supp. 3d. 18, 22 (D. Mass May 14, 2018). Therefore, this Court maintains jurisdiction over J.Z.S.'s habeas petition.

It is not disputed that § 1226(a) is silent as to what burden of proof applies in bond hearings, and who bears that burden. Following the 1996 enactment of the IIRIRA, a noncitizen seeking release bore the burden of "demonstrat[ing] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." 8 C.F.R. § 236.1(c)(8). It is important to note, however, that this regulation applied *only* to the custody determination by the arresting officer. Nevertheless, the BIA soon adopted that standard and applied it to 1226(a), requiring a noncitizen detained pursuant to § 1226(a) to demonstrate "to the satisfaction of the immigration judge that he or she merits release on bond." *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006); *see also Matter of Fatahi*, 26 I. & N. 791, 795

20

n. 3 (B.I.A. 2016) (stating that the BIA has "consistently held that aliens have the burden to establish eligibility for bond while proceedings are pending.").

Respondent urges the Court to follow relevant BIA guidance. However, pursuant to the Supreme Court's recent decision in *Loper Bright Enter. v. Raimondo*, courts "need not defer to any agency interpretation of law just because a statute is ambiguous." 603 U.S. 400, 412-413 (2024). The Court acknowledges and considers the BIA's interpretation. Nevertheless, for the sake of completeness, this Court will look towards other courts for additional guidance on the matter. While this issue has not yet been addressed by the Sixth Circuit, there is persuasive authority from various circuit courts to guide this Court in its analysis.

The Court first turns to *Hernandez-Lara v. Lyons,* 10 F.4th 19 (1st Cir. 2021), a First Circuit Court of Appeals case with facts similar to the ones before this Court. In *Hernandez-Lara,* the petitioner, a native and citizen of El Salvador, entered the United States in 2013 and was detained in 2018. 10 F.4th at 23. One month after being detained, she was granted a custody redetermination hearing in which the IJ denied bond after placing the burden on the petitioner. *Id*. at 24. The petitioner subsequently filed a petition for writ of habeas corpus, arguing that her Fifth Amendment rights were violated when the IJ placed the burden on her, rather than the government. *Id*. at 25.

In its analysis, the First Circuit determined that the three-part balancing test in *Mathews v. Eldridge*, 424 U.S. 893 (1976), was the appropriate standard to use in answering whether the "Due Process clause of the Fifth Amendment entitles a noncitizen detained pursuant to Section 1226(a) to a bond hearing at which the government bears the burden of proving by clear and convincing evidence that the noncitizen is dangers or

a flight risk." *Id*. at 27. Beginning with the first factor, private interest, the court concluded that there was "no question" that the petitioner suffered a substantial deprivation of liberty when she was "incarcerated alongside criminal inmates . . . for over ten months." *Id*. at 28. The Court additionally reasoned that because the "exact length of detention under section 1226(a) is impossible to predict and can be quite lengthy" the first factor weighed heavily in the petitioner's favor. *Id*. at 29.

The second factor, risk of erroneous deprivation, was also found to weigh in petitioner's favor. *Id*. at 30. The court considered that because noncitizens (1) have no right to counsel; (2) experience difficulty in gathering evidence on their behalf; (3) often lack full proficiency in English; (4) are not familiar with immigration law and procedures; and (5) face the difficulty of proving a negative, the "detainee often starts out behind the eight ball in a bond proceeding, and the opportunities for prejudicial error abound." *Id*. at 30-31. As a result, the court reasoned, "the odds of error in the weighing of such evidence (or its absence) are likely reduced by placing the burden on the government, as in virtually all other instances of proposed lengthy detention." *Id*. at 31.

Finally, as to the third factor, government's interest, the court acknowledged that "prompt executing of removal orders is a legitimate governmental interest." *Id*. at 32. However, the court clarified that "[w]hat is at stake . . . is not the power of the government to detain noncitizens who may cause harm or flee during removal proceedings, but rather who should bear the burden of proving noncitizens pose a danger or risk of flight." *Id*. The Court considered various factors such as interest in obtaining records, impact on society, and general financial costs. *Id*. at 33. "In short" the court concluded, "given the risk that the current procedures lead to many instances of needless detention, entailing

22

substantial social and financial costs, the public interest in placing the burden of proof on the detainee is uncertain at best, and may well be negative." *Id*. Thus, the First Circuit held that "the government must bear the burden of proving dangerousness or flight risk in order to continue detaining a noncitizen under section 1226(a)." *Id*. at 39.

In *Velasco Lopez v. Decker*, the Second Circuit conducted a similar analysis. 978 F.3d 842 (2d. Cir. 2020). There, the petitioner received a custody redetermination hearing upon detention, however he was denied bond after the burden was placed on him. *Id*. at 847. The petitioner was then detained for an additional fourteen months before filing a petition for a writ of habeas corpus. *Id*. Similar to the First Circuit, the Second Circuit concluded that the *Mathews* test governed its analysis. *Id*. at 851. After analyzing all three factors, the court reasoned that "shifting the burden of proof to the Government to justify continued detention promotes the Government's interest—one we believe to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose." *Id*. at 854. Thus, the Second Circuit "conclude[d] that the district court appropriately addressed the [due process] violation by ordering a new hearing at which the Government was called upon to justify continued detention." *Id*. at 855.

The Court notes that district courts all around the country have similarly concluded that the burden of proof to show that the noncitizen is a danger or flight risk should be on the government. *See Azalyar v. Raycraft*, No. 1:25-cv-916, 2026 WL 30741, at *5 (S.D. Ohio Jan. 2, 2026) ("Respondents must provide a custody redetermination hearing at which the government bears the burden of justifying [the petitioner's] continued detention"); *Darko v. Sessions*, 342 F. Supp. 3d. 429, 435 (S.D.N.Y. Oct. 19, 2018) ("Since *Jennings*, a number of district courts have taken up the question left open by the

23

Supreme Court, and there has emerged a consensus view that where, as here, the government seeks to detain an alien pending removal proceedings, it bears the burden of proving that such detention is justified."); *Singh v. Barr*, 400 F. Supp. 3d. 1005, 1018 (S.D. Cal. Aug. 30, 2019) ("The Court agrees with the reasoning of its sister courts and concludes that the Fifth Amendment's Due Process Clause requires the Government to bear the burden of proving by clear and convincing evidence, that continued detention is justified at § 1226(a) bond redetermination hearing."); *Alvarez Figueroa*, 680 F. Supp. 3d. at 26 ("[T]he Constitution requires placing the burden of proof on the government in § 1226(a) custody redetermination hearings."); *Riestra v. FNU LNU*, No. 2:26-cv-006360-KG-JHR, 2026 WL 905500, at * 2 (D.N.M. Apr. 2, 2026) ("Petitioner's prolonged detention violates the Fifth Amendment's Due Process Clause, and therefore she is entitled to a bond hearing where the Government bears the burden of proof."); *Rajesh v. Barr*, 420 F. Supp. 3d 78, 87-88 (W.D.N.Y. Oct. 29, 2019) ("The Court agrees with the district court cases holding that allocating the burden to a noncriminal alien to prove he should be released on bond under § 1226(a) violates due process because it asks '[t]he individual . . . to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the [Government]'" (quoting *Addington v. Texas*, 441 U.S. 418, 427 (1979))).

The Court finds the above case law persuasive. Petitioner's private interest in remaining free from detention is substantial, and the current procedures create a substantial risk of harm. Specifically, as seen here, noncitizens may be subject to indefinite detention. Finally, the government's interest does not outweigh the risk of indefinite detention. While the Court certainly acknowledges that the government has a

24

legitimate interest in ensuring a noncitizen's appearance and protecting its citizens, as numerous courts have concluded, shifting the burden imposes minimal additional hardships on the government. Moreover, as some courts have acknowledged, shifting the burden may further support the government's interests. *See Hernandez-Lara*, 10 F.4th at 33 ("[L]imiting the use of detention to only those noncitizens who are dangerous or a flight risk may save the government, and therefore the public, from expending substantial resources on needless detention."); *Velasco Lopez*, 978 F.3d at 855 ("When the Government incarcerates individuals it cannot show to be a poor bail risk for prolonged periods of time, as in this case, it separates families and removes the community breadwinners, caregivers, siblings and employees. The Government articulates no public interest that any of this serves and we see none.").

The Court acknowledges the circuits that have come to the opposite conclusion, which Respondent argues this Court should follow. (*See* Doc. # 6 at 9-10). Specifically, Respondent points out that the Ninth and Fourth Circuits have both concluded that placing the burden of proof on a noncitizen to prove they are not a danger nor a flight risk does not violate the Due Process Clause of the Fifth Amendment. *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022); *Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022). However, these decisions provide, at most, persuasive authority. The Court agrees with the First and Second Circuit's *Mathews* analysis, and in the absence of an authoritative decision from the Sixth Circuit Court of Appeals, respectfully declines to adopt the Ninth Circuit's holding in *Rodriguez Diaz* or the Fourth Circuit's holding in *Miranda*.

Accordingly, the Court concludes that Petitioner's Fifth Amendment Due Process right was violated when the IJ placed the burden on him in his custody redetermination

25

hearing. While Petitioner has requested immediate release, the Court finds that the appropriate remedy is granting his alternate request for a constitutionally adequate bond hearing. [8] Additionally, consistent with the other courts who have concluded that the government must bear the burden of proof, this Court concludes that a clear and convincing standard "provides the appropriate level of procedural protection." *Velasco Lopez*, 978 F.3d at 856.

## IV.   CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1)   Petitioner's Petition for Writ of Habeas Corpus (Doc. # 1) is **GRANTED**;

(2)   Petitioners Motion for Leave to Proceed under a Pseudonym (Doc. # 3) is **GRANTED**;

(3)   Respondent is **ORDERED** to **immediately release** Petitioner, or in the alternative, provide him with a **constitutionally adequate bond hearing in which the government bears the burden of proof** under 8 U.S.C. § 1226(a) **within seven (7) days of the date of this Order**; and

(4)   Respondent shall file a Status Report with this Court **on or before April 30, 2026** to certify compliance with this Order. The Status Report shall include when the bond hearing occurred, if bond was granted or denied, and if denied, the reasons for that denial.

---

[8]   Because the Court has concluded that Petitioner is entitled to a constitutionally adequate bond hearing in which the government bears the burden of proof, it need not address whether his prolonged detention entitles him to that same relief.

26

This 16th day of April, 2026.



Signed By:

**David L. Bunning**

**Chief United States District Judge**

G:\Judge-DLB\DATA\ORDERS\Cov2026\26-80 MOO re Habeas Petition.docx

27